# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Melissa Gale Longley,                                  Case No. 16-cv-2071 (TNL)

        Plaintiff,

v.                                                                          **ORDER**

Nancy A. Berryhill,[1]
Acting Commissioner of Social Security,

        Defendant.

Kirk C. Thompson, Kirk C. Thompson Law Office, 1201 Marquette Avenue, Suite 110, Minneapolis, MN 55403 (for Plaintiff); and

Pamela Marentette, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

Plaintiff Melissa Gale Longley brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. *The Acting Commissioner of Social Security*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner.html (last visited Sept. 21, 2017). Commissioner Berryhill is automatically substituted for the previous Acting Commissioner of Social Security Carolyn W. Colvin. Fed. R. Civ. P. 25(d) (public officer's successor is automatically substituted as party when officer ceases to hold office while action is pending).

This matter is before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 12, 15.) Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment (ECF No. 12) is **DENIED** and the Commissioner's motion for summary judgment (ECF No. 15) is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in October 2012, asserting that she has been disabled since April 2008, due to, among other things, a traumatic brain injury resulting in impaired language/vocabulary, memory, intelligence, comprehension, and verbal reasoning. (Tr. 17, 64, 80, 82, 98.) Plaintiff's DIB application was denied initially and again upon reconsideration. (Tr. 17, 78, 80, 96, 98.) Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 17, 113.)

The ALJ held a hearing in November 2014. (Tr. 17, 38, 40.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review. (Tr. 1-3, 12, 14-37.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have filed cross motions for summary judgment. (ECF Nos. 12, 15.) This matter is now fully briefed and ready for a determination on the papers.

## III. BACKGROUND

Previously, Plaintiff worked as a pharmacy technician at a retail store. (*See, e.g.*, Tr. 43, 221, 196, 510.) She lives with her husband and adult children. (Tr. 42, 221, 526.)

In late April 2008, Plaintiff suffered a traumatic brain injury and multiple fractures following a motor vehicle accident. (*See, e.g.*, Tr. 300-05, 306, 310-11, 313-14, 357-58, 361-63, 364, 373, 382, 653-54.) Plaintiff underwent a serious of medical procedures to treat her injuries. (*See, e.g.*, Tr. 300-05, 306, 310-11, 313-14, 357-58, 366-72, 383-99, 446-50, 656-57.)

### A. 2008 Accident

When Plaintiff was initially admitted to the hospital, her speech was "intelligible" and she was repeating "help me, help me," but did not respond to questions or commands. (Tr. 366.) Approximately one month after her accident, Plaintiff continued to be confused with impaired insight, judgment, and memory. (Tr. 326, 328, 330.) Plaintiff was also exhibiting difficulties with speech, including rambling, being off topic, aphasia, and trouble finding words. (Tr. 326, 328.)

A cognitive and language evaluation was conducted by a speech language pathologist near the end of June 2008. (Tr. 453-456.) Plaintiff was noted to have impairments in awareness, functional memory, immediate recall, and verbal expression. (Tr. 454.) Plaintiff was described as "very tangential, verbose and jumps around from topic to topic midsentence." (Tr. 456.) She had "[d]ifficulty with expressing thoughts and ideas due to tangentiality [sic] and language issues"; was "[u]nable to understand [the] time of year, holidays or events"; was "[u]nable to remember immediately after hearing information"; and appeared "[c]onfused and unable to concentrate." (Tr. 454; *see* Tr. 455-56, 466, 469, 471.) It was also noted that Plaintiff did not appear to be aware of her difficulties. (Tr. 456; *see* Tr. 470.)

Hospital discharge notes generated around the same time describe Plaintiff as "present[ing] with confusion, aphasia,[2] and restlessness." (Tr. 358; *accord* Tr. 301, 311, 314, 660.) Plaintiff's restlessness had improved over time but "she tended to be impulsive at times" and did not consistently follow instructions. (Tr. 358; *accord* Tr. 301, 311, 314, 660.) "With respect to her cognitive defects, [Plaintiff] showed a fluent aphasia and impaired naming." (Tr. 358; *accord* Tr. 301, 311, 314, 660; *see* Tr. 304, 657, 659.) Plaintiff's auditory comprehension and aphasia were noted to be improving with therapy. (Tr. 301, 311, 314, 358, 660.) "With cognitive tasks, she was functioning at a moderate to high level with minimal assistance." (Tr. 358; *accord* Tr. 301, 311, 314, 660.) "With instrumental activities of daily living, she was independent." (Tr. 358; *accord* Tr. 301, 311, 314, 660.) Plaintiff was again "noted to have limited awareness into her deficits." (Tr. 358; *accord* Tr. 301, 311, 314, 660.) During the discharge examination, Plaintiff had "fluent aphasia" but could "follow directions well," and she was "redirectable." (Tr. 358; *accord* Tr. 301-02, 311-12, 314, 660-61; *see* Tr. 304.) Plaintiff was prescribed Effexor[3] for improved mood and cognition and Seroquel[4] "to help with restlessness, impulsivity, and sleep." (Tr. 358; *accord* Tr. 301, 311, 314, 660; *see* Tr. 304.)

---

[2] Aphasia is "[i]mpaired or absent comprehension or production of, or communication by, speech, writing, or signs, due to an acquired lesion of the dominant cerebral hemisphere." *Aphasia*, Stedman's Med. Dictionary 110 (27th ed. 2000).

[3] Effexor is a brand name for venlafaxine, a medication used to treat depression, generalized anxiety disorder, panic disorder, and social anxiety disorder. *Venlafaxine (By mouth) (Effexor)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012623/ (last visited on Sept. 21, 2017).

[4] Seroquel is a brand name for quetiapine, a medication used to treat schizophrenia, mania, and depression. *Quetiapine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a698019.html (last visited on Sept. 21, 2017).

## B. Post-Accident Treatment

### 1. 2008

Around the middle of July 2008, Plaintiff followed up with her primary care physician, Thomas A. Leaf, M.D. (Tr. 499-501, 613-14, 739-41.) Plaintiff reported that she was "doing much better at home" and had stopped taking all of her medications. (Tr. 500; *accord* Tr. 613, 740.) Plaintiff still had no memory of the accident. (Tr. 500, 613, 740.) She also reported continued "word finding difficulty." (Tr. 500; *accord* Tr. 613, 740.) Dr. Leaf noted "some word finding problems, but overall [Plaintiff's] speech was fairly normal and she seemed oriented." (Tr. 500; *accord* Tr. 613, 740; *see* Tr. 495, 501.) Dr. Leaf also noted that Plaintiff was to receive speech therapy at her home. (Tr. 500, 613, 740.)

In early October, Plaintiff followed up with Dr. Leaf. (Tr. 493-94, 619-20, 744-45.) Plaintiff had finished with physical and occupational therapy, but was still continuing with speech therapy. (Tr. 493, 620, 744; *see* Tr. 7535-59, 769-76.) Dr. Leaf noted that he spoke with Plaintiff's speech therapist who indicated that, while Plaintiff discussed going back to work, the speech therapist did not feel that Plaintiff was able to "to that at this time because she has difficulty organizing her thoughts and difficulty finding words and using word substitutions." (Tr. 493; *accord* Tr. 620, 744.) Plaintiff experienced "some improvement" and was "focusing better," but did "have literal interpretations of figures of speech." (Tr. 493; *accord* Tr. 620, 744.) Plaintiff did better when things were written versus "auditory input." (Tr. 493; *accord* Tr. 620, 744.) During the appointment, Plaintiff reported being unable to remember names, and Dr.

Leaf noted that she had "some word finding difficulties and substitutions." (Tr. 493; *accord* Tr. 620, 745.)

Towards the end of October, Plaintiff was seen by Sarah B. Rockswold, M.D. (Tr. 526, 528, 801-03.) Plaintiff again reported difficulties with her memory, words, and concentration. (Tr. 526, 529, 802.) Dr. Rockswold observed that Plaintiff was "aphasic" and at times had difficulty comprehending what Dr. Rockswold said. (Tr. 527; *accord* Tr. 529, 802.) Plaintiff also gave answers that were "inappropriate for the questions" being asked. (Tr. 527; *accord* Tr. 529, 802.) Plaintiff's fund of knowledge, insight, and judgment were all adequate. (Tr. 527, 529, 802.) Dr. Rockswold diagnosed Plaintiff with, among other things, "[c]ognitive defects including aphasia secondary to severe traumatic brain injury." (Tr. 527; *accord* Tr. 529, 803.) Dr. Rockswold noted that Plaintiff would benefit from a more intense therapeutic program, but that the drive was difficult for Plaintiff and her husband to make once per week. (Tr. 527, 529, 803.) Dr. Rockswold referred Plaintiff for neuropsychological testing. (Tr. 527, 530, 803.)

Plaintiff underwent neuropsychological testing in November with James B. Thomson, Ph.D. (Tr. 533-38, 539-44, 794-801.) She again reported "difficulty with naming, word substitution, neologisms, and hesitation and delay in speech." (Tr. 534; *accord* Tr. 540, 795.) Plaintiff reported "no memory deficits except for language," which her husband confirmed. (Tr. 534; *accord* Tr. 540, 795.) Plaintiff's husband also reported that Plaintiff "has difficulty dealing with friends if they talk too rapidly." (Tr. 534; *accord* Tr. 540, 795.) Plaintiff described her current "activities of cleaning, housework, laundry, [and] shopping, and stated that she walked regularly when it was warmer." (Tr.

534; *accord* Tr. 540, 796.)   Plaintiff's husband stated "that she runs the entire household." (Tr. 534; *accord* Tr. 540, 796.)

Dr. Thomson noted that Plaintiff's symptom questionnaire "was marked in a number of places, with many erasures, and then filled out again with words written in some places and check marks in other places," suggesting that Plaintiff "may have filled it out incorrectly or misunderstood it initially." (Tr. 534; *accord* Tr. 540, 796.) Dr. Thomson noted that Plaintiff's "[e]xpressive speech was clearly impaired . . . with repetitive and occasionally disorganized speech." (Tr. 535; *accord* Tr. 541, 797.) Dr. Thomson concluded that Plaintiff "demonstrated grossly impaired verbal reasoning, general knowledge, concentration, and working memory abilities because of an apparent combination of auditory comprehension difficulty and dysnomia." (Tr. 537; *accord* Tr. 543, 799.) Plaintiff's "[v]isual reasoning abilities, by comparison, were average to superior, with average concentration." (Tr. 537; *accord* Tr. 543, 799.)

Overall, Dr. Thomson concluded that Plaintiff

> demonstrated significant impairment in language-related tasks, reflecting aphasic symptoms of auditory comprehension, verbal expressive difficulty, reading recognition impairments, reading comprehension impairment (presumably), verbal memory impairment, verbal fluency impairment, and mental inflexibility in one visual test. Other visual tests found grossly intact attention, focus, perception, memory, reasoning, problem solving, planning, and fluency, with mildly reduced efficiency in letter and number recognition in scanning and cancellation tests. Overall, the results appear to relatively clearly indicate a focal cognitive dysfunction implicating language centers, similar to a left hemisphere stroke syndrome.

(Tr. 538; *accord* Tr. 544, 799.)  Dr. Thomson recommended that Plaintiff continue with speech therapy.  (Tr. 538, 544, 799.)  Dr. Thomson also explained to Plaintiff that she could not return to her previous job as a pharmacy technician "given her difficulty with reading recognition, reading comprehension, and other language-based deficits that would be very dangerous in a pharmacy setting where errors could put someone's life at risk."  (Tr. 538; *accord* Tr. 544, 799.)

### 2.  2009

Plaintiff had three additional appointments with Dr. Rockswold in 2009.  (Tr. 546-50, 564-68, 572-75, 792-793.)  Plaintiff felt that her comprehension was improving and she was "working on words and remembering them."  (Tr. 547; *accord* Tr. 549, 792.)  Dr. Rockswold noted that Plaintiff continued to have problems with aphasia, but she was improving and answered questions appropriately.   (Tr. 547, 550, 565, 567, 793.)  Plaintiff's fund of knowledge, insight, and judgment were noted to be improving as well during the first two appointments, but her insight and judgment were described as "still lacking" at the third.  (*Compare* Tr. 547, 550, 565, 567, 793 *with* Tr. 572, 574.)  Similar to Dr. Thomson, Dr. Rockswold also felt it was unsafe for Plaintiff to work as a pharmacy technician and wrote two letters for Plaintiff to this effect.  (Tr. 517, 548, 550, 553, 573, 575, 577, 793.)

During the second appointment, Dr. Rockswold noted that Plaintiff had been discharged from speech therapy at the end of February because "she had plateaued in her goals," and was described as "continu[ing] to have mild to moderate deficits in figurative language and organized verbal expression and word finding for complex information or

8

conversation requiring multiple sentences." (Tr. 565; *accord* Tr. 566, 567, 568; *see* Tr. 761-68, 769-76.) Plaintiff also reported that she had returned to her previous employer and was working as a cashier "a few hours a day." (Tr. 565; *accord* Tr. 567.)

At the third appointment, Dr. Rockswold noted that Plaintiff "recently underwent repeat neuropsychological testing" with Dr. Thomson, which showed "continued impairment in language-related tasks, though there is some improvement in functional auditory memory." (Tr. 572; *accord* Tr. 574; *see* Tr. 512-16.) Plaintiff also had "some improvement in functional auditory memory more so than reading recognition, reading comprehension, or naming." (Tr. 572; *accord* Tr. 574, 515.) Dr. Thomson stated that Plaintiff "could have problems in accuracy and reliability in her work, even as a cashier," and "she would be more successful in work that does not require significant amounts of written or even spoken communication or learning that requires reading or spoken information." (Tr. 572; *accord* Tr. 574, 515.) On the other hand, Plaintiff was "primarily unimpaired in tasks requiring nonverbal abilities, including perceptual analysis, visual memory, visual reasoning, visual problem solving, visual planning, motor coordination, [and] visual memory." (Tr. 515.)

Dr. Rockswold further noted that Plaintiff was being seen in speech pathology, where "[s]he continue[d] to present with moderate expressive aphasia characterized by decreased word finding, word substitution and repetition." (Tr. 572; *accord* Tr. 519, 574.) Notes from the speech pathology consultation stated that, despite her language deficits, Plaintiff was "compensating quite well on a functional level, using various compensation strategies to get her thoughts and ideas across," and "[r]eceptively she is

able to follow directions and engage in conversation appropriately and within context, but state[s] th[a]t she does intermittently require repetition or clarification on a functional level." (Tr. 519-20.) It was also noted that Plaintiff was "unsure if she is interested in resuming therapy at this time, but did agree to return 1-2 more times to complete assessment and discuss potential goals." (Tr. 520.)

### 3. 2013

Plaintiff participated in a three-day vocational evaluation by Courage Center in February 2013. (Tr. 221-29.) Plaintiff underwent a battery of tests designed to assess areas such as comprehension and vocabulary skills, math skills, and ability to follow verbal instructions. (Tr. 222-27.) Ultimately, the vocational evaluator concluded that Plaintiff read above a sixth-grade reading level, had basic math skills, demonstrated good spatial skills, showed attention to detail, and performed at a near competitive work speed. (Tr. 228.) Additionally, the vocational evaluator noted that Plaintiff had difficulty with multistep verbal instructions, performed at a below competitive work speed, and could be abrupt in her interpersonal skills. (Tr. 228.) The vocational evaluator listed repetition, checklists, routing/structure, and concrete tasks as suggested accommodations. (Tr. 228.)

In June, Plaintiff returned to Dr. Leaf, asking about medication that could help with her memory. (Tr. 607, 638-40.) Plaintiff was no longer working as a cashier. (Tr. 607, 638.) Plaintiff reported completing a program for certified nursing and home health assistants, but had been unable to find work. (Tr. 607, 638-39.) While Plaintiff was alert and oriented, Dr. Leaf noted that her thoughts were scattered and disorganized. (Tr. 608, 640.) Plaintiff was also tangential and had difficulty expressing her thoughts despite

referring to notes. (Tr. 608, 640.) Dr. Leaf recommended an additional neuropsychological evaluation. (Tr. 608, 640.)

Notes from visits Plaintiff had with a nurse practitioner in each of October and November indicated, in relevant part, that Plaintiff's speech was normal, she could reason abstractly, and her thoughts were not tangential. (Tr. 643, 651.) During one of the appointments, however, it was noted that Plaintiff was "overinclusively verbose and has difficulty staying on task of conversation." (Tr. 651.)

## IV. MEDICAL OPINIONS

### A. Consultative Examination: Marlin Trulsen, Ph.D., L.P.

Marlin Trulsen, Ph.D., L.P., performed a psychological consultative examination in April 2013. (Tr. 579-89.) Plaintiff reported that, although she had tried working as a cashier for her former employer after the accident, she left in 2011 after "feeling poorly treated by the employer." (Tr. 580.) Plaintiff listed watching television and movies, Internet research, and listening to music as her hobbies. (Tr. 581.) Plaintiff reported helping to care for her daughter's pet rabbit, cleaning up around the house, getting the mail, running errands, preparing meals, doing laundry, shopping, and assisting with yard work. (Tr. 581; *see* Tr. 196, 200, 201, 202.)

Plaintiff reported "problems remembering specific words for use in general conversations and . . . taking longer to recall the words or at other times not finding the words at all." (Tr. 580; *see* Tr. 203, 239, 247, 254.) "She [also] noted remembering details of conversations can seem difficult and results in more confusion occasions for her." (Tr. 580; *see* Tr. 203.) Plaintiff "reported experiencing greater difficulty

concentrating and experiencing easier occasions of distraction than previous to her head injury. She noted this as more frustrating when trying to complete school responsibilities or other tasks requiring concentration." (Tr. 580; *see* Tr. 203, 254.)

Dr. Trulsen noted that Plaintiff "was noticeable for patterns of speech that appeared to reflect her loosing [sic] track of the focus of the conversation and not appearing fully aware of loosing [sic] track and requiring the examiner to redirect the conversation." (Tr. 582.) Plaintiff

> demonstrated occasions of pausing and appearing to try to find specific words when responding and then moving on to use other words for her various responses. Her speech otherwise appeared average for pitch, rate, volume, with content appropriate for topics discussed. Her perceptions appeared appropriate. She appeared generally alert and oriented x[]4, made appropriate eye contact, and appeared in a pleasant mood. She demonstrated a full range of . . . affect for topics discussed. Her judgment and insight appeared developed below expected levels as . . . she appeared less aware of her general difficulties with conversation processes.

(Tr. 582.)

After conducting a series of tests, Dr. Trulsen concluded that Plaintiff's

> general mental capacity for understanding appears to demonstrate a moderate to occasionally marked level of impairment as suggested by her general pattern for difficulties with various conversations and appearing to loose [sic] track of the general conversation focus[]and appears for the most part unaware of this pattern. As a result, it appears that she may under report her general difficulties for this pattern. Her general mental capacity for remembering appears to demonstrate occasions of slight impairment. Her general mental capacity for following instructions, sustaining attention and concentrating all appear to demonstrate a slight to occasionally moderate level of impairment especially as

[she] becomes required to discuss and dialogue about processes.

[Plaintiff's] general mental capacity for carrying out work-like tasks with reasonable persistence or pace would appear likely to demonstrate a moderate to occasionally marked level of impairment due to the observed pattern for her general loss of focus for the conversation or particular activity details and seemingly unaware of this pattern. Her general mental capacity for responding appropriately to brief and superficial contact with coworkers and supervisor[s], as well as tolerating stress and pressures typically found in an entry-level workplace appear adequate in development and show no general impairment.

. . . .

She demonstrated an average ability to hear and produce normal conversation and sustain speech with the above noted pattern for appearing to lose track and focus of the conversation details and appearing fairly unaware of this pattern.

(Tr. 587-88; *see* Tr. 583-86.)

## B. Consultative Examination: A. Neil Johnson, M.D.

A. Neil Johnson, M.D., performed a physical consultative examination in April 2013 as well. In relevant part, Dr. Johnson noted that Plaintiff was "loquacious" with "somewhat hyper" speech. (Tr. 591; *see* Tr. 592.) Plaintiff "ha[d] a hard time thinking about what words she wants to use." (Tr. 591; *see* Tr. 595.) Plaintiff reported "some trouble with reading comprehension," but claimed that her memory and concentration were "satisfactory." (Tr. 591; *see* Tr. 595.) When asked why she was unable to work, Plaintiff "had a hard time articulating why she could not work." (Tr. 591.) Plaintiff otherwise "seemed to answer questions appropriately and without difficulty" and could

"hear conventional speech without limitation." (Tr. 592.) Plaintiff "was able to accurately subtract 7 from 100, multiply 8 x 9 and divide 100 by 20." (Tr. 595.) Dr. Johnson noted some "subtle finds with word finding and word comprehension." (Tr. 595.)

### C. Medical Source Statement: Thomas Leaf, M.D.

Dr. Leaf completed a medical source statement in May 2014. (Tr. 820.) Dr. Leaf described Plaintiff's diagnoses as traumatic brain injury with "some speech difficulty," including "word finding problems, memory issues, [and] disorganized thoughts." (Tr. 820.) Dr. Leaf indicated that Plaintiff experienced personality changes, problems with judgment, speech/communication difficulties, and difficulties with her memory. (Tr. 820.)

Dr. Leaf opined that Plaintiff was disabled and unable to work for at least 12 months. (Tr. 820.) At the same time, Dr. Leaf opined that Plaintiff would "[n]ever" miss a day of work. (Tr. 820.) Dr. Leaf opined that Plaintiff would be off-task 25% or more of the time due to her symptoms and limitations. (Tr. 820.) Lastly, Dr. Leaf checked "[n]o" when asked if Plaintiff was able to "perform a simple, sit down type job on a full time basis," stating that Plaintiff had "[d]ifficulty finding a job she could do with [her] cognitive limitations." (Tr. 820.)

### D. State Agency Consultants

In relevant part, the state agency consultants assessing Plaintiff's physical residual functional capacity both concluded that Plaintiff's ability to speak was limited and opined

that she should "[a]void work requiring continuous verbal communication." (Tr. 73; *accord* Tr. 91.)

The state agency consultants assessing Plaintiff's mental residual functional capacity opined that: (1) Plaintiff "retained sufficient mental capacity to concentrate on, understand, and remember routine, repetitive instructions, but would be markedly impaired for detailed or complex/technical instructions," (Tr. 75; *accord* Tr. 91-92); (2) her "ability to carry out routine, repetitive tasks would be intact, but markedly impaired for detailed and complex tasks," (Tr. 76; *accord* Tr. 93); (3) her "ability to handle co-worker and public contact would be reduced but adequate to handle brief and superficial contact," (Tr. 76; *accord* Tr. 94); (4) her "ability to tolerate and respond appropriately to supervision would be reduced but adequate to handle ordinary levels of supervision found in a customary work setting," (Tr. 76; *accord* Tr. 93); and (5) her "ability to tolerate and respond appropriately to stress in the work place would be reduced but adequate to handle the routine stresses of a routine, repetitive work setting," (Tr. 77; *accord* Tr. 94).

## V. HEARING BEFORE THE ALJ

At the hearing, Plaintiff testified that she was unable to work because she could no longer verbalize things correctly. (Tr. 44; *see* Tr. 59.) Plaintiff testified that "almost every day there's a weird word . . . that's missing." (Tr. 60.) Plaintiff testified that she had to go through the nursing assistant course twice and had difficulty concentrating. (Tr. 58-59.) The ALJ asked Plaintiff if she received a settlement from the accident and Plaintiff testified that she received a monthly annuity. (Tr. 44-45; *see* Tr. 52.) During the hearing, the ALJ commented on Plaintiff's speech, stating that it "doesn't seem like she is

ineffective. She has issues but obviously—I don't know that she's ineffective. She's been reasonably effective here today." (Tr. 50-51.)

The ALJ asked the vocational expert if he reviewed the Courage Center vocational evaluation and to opine on the employability of a hypothetical individual fitting the resultant profile. (Tr. 46-47, 48-49.) The vocational expert testified that such an individual could perform unskilled work that could be "learned via demonstration as opposed to a lot of oral direction," such as a bench assembler, janitor/cleaner, and officer helper. (Tr. 48-49.)

The ALJ then asked the vocational expert about a second hypothetical individual who had "no communication limitations in hearing, but in speaking there would be some limitations which would involve avoidance of work requiring continuous verbal communication." (Tr. 49.) This hypothetical individual had a "mental residual functional capacity [that] would rule out detailed and complex tasks, [but] would be sufficient for routine and repetitive reinforced type tasks," and "public contact would need to be reduced to brief, meaning for a short period of time, and superficial, not on a decision-making basis, consistent with her speech limitations." (Tr. 49.) The vocational expert testified that this second hypothetical individual would be able to perform the three jobs previously identified as well as work as a hand packager. (Tr. 49-50.)

Then-counsel[5] for Plaintiff asked the vocational expert whether Dr. Trulsen's finding that Plaintiff's "mental capacity for carrying out work-like tasks with reasonable persistence or pace . . . [was] moderately to occasionally markedly impaired" would

---

[5] Plaintiff was represented by different counsel at the ALJ hearing. (*See* Tr. 110, 112; *see also* Tr. 38, 40.)

preclude employment. (Tr. 61.) The vocational expert responded that "if that impairment resulted in a person being off task in excess of 10% of a workday over and above regularly scheduled breaks, it's my opinion that productivity standards would not be met" and those jobs would be eliminated. (Tr. 61.)

## VI. ANALYSIS

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

### A. ALJ'S Decision

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or

was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

In relevant part, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date and her "traumatic brain injury with an organic mental disorder" constituted a severe impairment. (Tr. 19-20.) The ALJ concluded that this impairment did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20-22.)

The ALJ concluded that Plaintiff had the residual functional capacity to perform medium work with additional limitations, including "avoid[ing] work requiring continuous communication"; "rul[ing] out detailed or complex tasks but sufficient for routine repetitive 3-4 step tasks"; and allowing for "brief and superficial public contact with no decision making and consistent with her speech limitations." (Tr. 22.) The ALJ determined that Plaintiff's "complaints of aphasia, difficulty communicating and organizing warrant[ed] restrictions in the complexity of work, communication frequency and intensity, and contact with public" and her "[a]lleged adaptive deficits warrant[ed] routine and repetitive work tasks." (Tr. 23; *see* Tr. 28.) The ALJ found that Plaintiff's subjective complaints were not fully credible and gave no weight to those portions of Dr. Leaf's opinion regarding Plaintiff's non-physical limitations. (Tr. 23, 28-30.) Based on the testimony of a vocational expert, the ALJ found that Plaintiff was capable of performing jobs in the national economy such as light bench assembler, janitor/cleaner,

office helper, and hand packager and ultimately concluded that Plaintiff was not disabled. (Tr. 31-32.)

## B.  Issues for Review

Plaintiff's challenges to the ALJ's decision all relate to the determination of her residual functional capacity.  A claimant's "residual functional capacity is the most [she] can do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence.").  "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quotation omitted).  "Medical records, physician observations, and the claimant's subjective statements about h[er] capabilities may be used to support the [residual functional capacity]."  *Id.*  "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."  *Id.* (quotation omitted); *see* 20 C.F.R. § 404.1546(c).  Plaintiff asserts that the ALJ (1) did not give appropriate weight to the opinion of Dr. Leaf; (2) did not properly take into account the extent of her symptoms; and (3) improperly assessed her credibility.

## 1.  Dr. Leaf

The Court begins with Plaintiff's argument that the ALJ did not give appropriate weight to the opinion of Dr. Leaf regarding her non-physical impairments.  There is no

dispute that Dr. Leaf is an acceptable medical source who treated Plaintiff. *See* 20 C.F.R. §§ 404.1502 (identifying claimant's own physician as treating source), .1513(a)(1) (identifying licensed physicians as acceptable medical sources). A treating source's "opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).

"Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted). The opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see Cline*, 771 F.3d at 1103 (permitting the opinions of treating physicians to be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions") (quotation omitted). When a treating source's opinion is not given controlling weight, the opinion is weighed based on a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir.

2003). The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *Cline*, 771 F.3d at 1103.

While the ALJ accorded substantial weight to that portion of Dr. Leaf's opinion addressing Plaintiff's physical abilities, the ALJ gave no weight to the portions of Dr. Leaf's opinion regarding her non-physical impairments: Plaintiff would be off-task 25% or more of the time, and she was unable to perform a simple, seated job on a full-time basis due to difficulty finding a job that she was able to do with her cognitive limitations. The ALJ found that these conclusions were not consistent with the record as whole. The ALJ also noted that Dr. Leaf's assessment of Plaintiff's ability to remain on task was not supported by any mental status or psychological examination. The ALJ reasoned that Dr. Leaf "appear[ed] to deal more so with . . . [Plaintiff's] physical impairments" and "[t]here is no indication that he reviewed or is qualified to assess the vocational implications of . . . [Plaintiff's] neuropsychology and other traumatic brain injury treatment." (Tr. 30.)

As an initial matter, the ALJ properly gave no weight to Dr. Leaf's opinion that Plaintiff was unable to perform a simple, seated job on a full-time basis because "it strayed beyond medical issues to a legal opinion on the applicability of the social security statute." *Julin*, 526 F.3d at 1089 (treating physician's opinion that claimant was unable to work full time strayed beyond medical issues and not entitled to controlling weight); *accord Stormo*, 377 F.3d at 806 ("Dr. Gutnik's conclusory statement 'that Lance's problems would make it difficult for him to hold any significant employment,' similarly asserts an inappropriate legal conclusion.") (citation omitted).

Nor does Dr. Leaf's reliance on Plaintiff's apparent difficulty in finding employment render her disabled as a matter of course. So long as work exists in significant numbers whose requirements a claimant is able to meet with his or her physical and mental capabilities and vocational qualifications, it does not matter, for example, if the claimant has been unable to get work, there are no job openings for the claimant, or the claimant would not actually be hired to do the work he or she could otherwise do. 20 C.F.R. § 404.1566(c); *see, e.g., Kerns v. Apfel*, 160 F.3d 464, 467 (8th Cir. 1998) ("[S]tatutory definitions and social security regulations provide that disability is to be evaluated in terms of a claimant's ability to perform jobs rather than on his or her ability to obtain them."); *Glassman v. Sullivan*, 901 F.2d 1472, 1474 (8th Cir. 1990) ("Under the Social Security regulations, the test for disability is not whether an individual can actually get hired for a job, but whether he or she has the physical and mental capacity to adequately perform one."). Accordingly, the Court turns to Plaintiff's arguments as applied to Dr. Leaf's opinion that Plaintiff would be off-task 25% or more of the time.

Plaintiff argues that, when assessing the weight to be accorded to Dr. Leaf's opinion regarding her ability to stay on task, the ALJ did not properly take into account the number of times she had seen Dr. Leaf. The nature of the treatment relationship is one factor to consider when assigning weight to opinion evidence. 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). But Plaintiff's contention that the ALJ did not consider how

many times she saw Dr. Leaf is belied by the ALJ's discussion of these visits in the decision. The ALJ specifically described Dr. Leaf as Plaintiff's primary care physician and discussed each of the "at least four times since the accident" Plaintiff states that she saw Dr. Leaf. (Pl.'s Mem. in Supp. at 15, ECF No. 13.) Importantly, this factor is only one of several to be considered.

Based on other factors, the ALJ properly determined that Dr. Leaf's opinion that Plaintiff would be off-task 25% or more of the time was not entitled to controlling weight. While Plaintiff argues that the ALJ "did not assess and consider the medical evidence that supported Dr. Leaf's assessment," (Pl.'s Mem. in Supp. at 15), the ALJ in fact expressly considered the supportability of Dr. Leaf's opinion. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant medical evidence to support an opinion, particularly medical signs and laboratory findings the more weight we will give that opinion."). Substantial evidence in the record supports the ALJ's conclusion that Dr. Leaf primarily dealt with Plaintiff's physical impairments rather than her mental impairments and his opinion regarding Plaintiff's ability to remain on task was not supported by findings from mental status examinations or psychological evaluations. And, as discussed below, Dr. Leaf's opinion was inconsistent with other medical evidence in the record showing that Plaintiff was able to maintain attention and focus when speech was not required. In a similar vein, the ALJ appropriately took into account that this opinion appeared to be outside Dr. Leaf's area of expertise. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist

23

about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Perhaps most significantly, the ALJ properly considered Dr. Leaf's opinion in the context of the entire record. *See* 20 C.F.R. § 404.1527(c)(2); *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014) ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control.") While Dr. Leaf opined that Plaintiff would be off-task 25% or more of the time, this opinion was inconsistent with other medical evidence in the record showing that Plaintiff's focus had improved and she demonstrated at least average performance in non-language related tasks, including maintaining attention and focus and paying attention to detail. As stated by the Commissioner, such findings undermine Dr. Leaf's opinion. Additionally, following the consultative examination, Dr. Trulsen concluded that Plaintiff's "mental capacity for following instructions, sustaining attention and concentrating all appear to demonstrate a slight to occasionally moderate level of impairment," which became more apparent as Plaintiff was "required to discuss and dialogue about processes." (Tr. 587.)

Plaintiff points to Dr. Trulsen's opinion that her mental capacity for carrying out work-like tasks with reasonable persistence and pace "demonstate[d] a moderate to occasionally marked level of impairment." (Tr. 587.) Dr. Trulsen stated that this opinion was based on Plaintiff's pattern of "general loss of focus for the conversation or particular activity details and [being] seemingly unaware of this pattern." (Tr. 587.) The ALJ concluded reasonably that such opinion was based on difficulties Dr. Trulsen observed Plaintiff to experience during conversations. When determining Plaintiff's

residual functional capacity, the ALJ accounted for the difficulties noted by Dr. Trulsen by limiting Plaintiff to work that did not require continuous conversation and involved only brief, superficial public contact.

Moreover, when evaluating Dr. Leaf's opinion, the ALJ did not incorrectly interpret the opinions of Drs. Rockswold and Thomson. Drs. Rockswold and Thomson each opined that Plaintiff should not return to her previous job as a pharmacy technician due to her speech and language difficulties, expressing serious concern over the dangers such deficits posed in the pharmacy setting. Plaintiff argues that these opinions do not mean that she is capable of performing other work. But, as Plaintiff herself acknowledges, Dr. Thomson opined that Plaintiff had little to no impairment with tasks requiring non-verbal abilities. And, Dr. Thomson in fact stated that Plaintiff would be more successful with work that did not involve significant amounts of written and spoken information. There is nothing in these opinions suggesting that Plaintiff's language-based deficits preclude her from any and all employment,[6] particularly when the ALJ's residual-functional-capacity determination accounted for Plaintiff's speech and language difficulties.

In the end, "it is the ALJ's function to resolve conflicts among the opinions of the various treating and examining physicians." *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (quotation omitted). The ALJ gave good reasons for assigning no weight

---

[6] Plaintiff argues that "Dr. Rockswold said that [she] would be unreliable in working given her language-based deficits," citing page 7 of Exhibit 6F in the administrative record. (Pl.'s Mem. in Supp. at 16.) The Court could find no notation by Dr. Rockswold to this effect.

to these portions of Dr. Leaf's opinion and substantial evidence in the record supports the ALJ's treatment of Dr. Leaf's opinion.

## 2. Symptoms

Plaintiff argues that the ALJ failed to recognize the extent of her traumatic brain injury and the resultant effects on her cognitive abilities and ability to perform with reasonable persistence and pace. Plaintiff cites places in the record documenting cognitive deficits following the accident, aphasia, reading difficulties, difficulties with conversation (both expressing her own thoughts and following along), Dr. Trulsen's opinion that her capacity for understanding was moderately to occasionally markedly impaired, and Dr. Leaf's opinion that Plaintiff was unable to work for at least 12 months and could not perform a simple, sit-down job on a full-time basis. Plaintiff argues that "[a]ll of the medical evidence over time shows the severity of [her] cognitive impairments." (Pl.'s Mem. in Supp. at 14.) The Commissioner responds that the limitations contained in the ALJ's residual-functional-capacity determination properly account for Plaintiff's speech and cognitive difficulties and Plaintiff has not shown the need for additional limitations.

Among other things, the ALJ limited Plaintiff to work that did not require continuous communication, did not involve detailed or complex tasks, and involved only brief and superficial public contact with no decision-making. In making this determination, the ALJ reasoned that Plaintiff's "complaints of aphasia, difficulty communicating and organizing warrant restrictions in the complexity of work,

communication frequency and intensity, and contact with the public," and her "[a]lleged adaptive deficits warrant routine and repetitive work tasks." (Tr. 22.)

Contrary to Plaintiff's assertion that the ALJ did not recognize the extent of her traumatic brain injury and resulting limitations, the ALJ's discussion of the medical evidence and residual-functional-capacity determination reflect careful consideration of how and to what extent Plaintiff's traumatic brain injury impacted her ability to function in the workplace. *See Stormo*, 377 F.3d at 807 ("It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability." (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)). The record reflects that, while Plaintiff was at times noted to demonstrate some improvement particularly with regard to answering questions, she continued to experience problems with language following the accident. Plaintiff's treatment providers, the consultative examiners, and the state agency consultants all noted at least some level of language impairment. Plaintiff testified that she had difficulty with verbalization and the ALJ observed first-hand Plaintiff's communication difficulties during the hearing.[7] The ALJ expressly recognized that "[t]he residual deficits [of Plaintiff's traumatic brain injury] are most notable in expressive and to a lesser degree receptive communication," warranting a "restriction on communication and public contact." (Tr. 28.) By limiting Plaintiff to work that did not

---

[7] Albeit in her discussion of the weight given to portions of Dr. Leaf's opinion, Plaintiff suggests that the ALJ impermissibly relied on his own opinion of Plaintiff's communication difficulties based on observations made at the hearing. "While the ALJ's observations cannot be the sole basis of his decision, it is not an error to include his observations as one of several factors." *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008); *see Johnson v. Apfel*, 240 F.3d 1145, 1148, 1149 (8th Cir. 2001) (ALJ's personal observations of claimant during hearing were "completely proper" as one factor in credibility determination). Here, any personal observations made by the ALJ were at most only a factor in the ALJ's overall consideration of the entire record. *See Lamp*, 531 F.3d at 632; *Johnson*, 240 F.3d at 1149.

require continuous communication and involved only brief and superficial public contact with no decision-making, the ALJ recognized and accounted for the continued language difficulties Plaintiff experienced following her traumatic brain injury.

At the same time, the evidence in the record also shows that, despite her language difficulties, Plaintiff was largely unimpaired in non-verbal tasks. Repeat neuropsychological testing by Dr. Thomson showed Plaintiff's attention, focus, memory, and problem-solving to be grossly intact for non-verbal tasks. The ALJ noted that this repeat testing "indicated that [Plaintiff] retained the ability to learn, [and] had low average to average academic proficiency," reasoning that the results "suggest[ed] the ability to perform . . . [a] reduced complexity of work." (Tr. 28.) Various notes in the record, including from a speech pathologist, the vocational evaluator, and Dr. Trulsen, also describe Plaintiff as able to follow instructions and sustain attention and concentration when multistep verbal instructions were not involved and she was not required to dialogue about the process. The ALJ also pointed to the findings of Dr. Trulsen in support of Plaintiff's ability to perform routine and repetitive tasks, noting that these "findings further suggest[] the intellect for routine and repetitive simpler tasks but again reflect difficulties with train of thought and communication." (Tr. 28.)

The state agency psychological consultants, whose opinions were given great weight, similarly concluded that Plaintiff was able to understand and remember routine, repetitive instructions and tasks but would be markedly impaired for detailed or complex/technical instructions and tasks. And for the reasons stated above, the ALJ properly gave no weight to Dr. Leaf's opinion that Plaintiff would be off-task 25% or

more of the time or that she was unable to perform a simple, sit-down job on a full-time basis.

Moreover, Plaintiff's daily activities reflect that, notwithstanding any residual language and cognitive deficits from her traumatic brain injury, she was able to carry out routine and repetitive tasks that were not detailed or complex and engage in brief, superficial contact with others. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) ("In evaluating a claimant's [residual functional capacity], consideration should be given to the quality of the daily activities and the ability to sustain activities, interests, and relate to others over a period of time and the frequency, appropriateness, and independence of the activities must also be considered.") (quotation omitted). Plaintiff reported watching television and movies, researching on the Internet, listening to music, caring for a pet rabbit, cleaning, getting the mail, running errands, preparing meals, doing laundry, shopping, and assisting with yard work. Her husband described her as "run[ning] the entire household." (Tr. 534.) As the ALJ correctly observed, this level of activity is inconsistent with the degree of impairment alleged.

In sum, the ALJ considered all of the relevant evidence, including the medical records, opinion evidence, and Plaintiff's activities, in assessing Plaintiff's functional limitations following her traumatic brain injury. *See Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013); *Perks*, 687 F.3d at 1092. It is not the role of this Court to reweigh the evidence. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). When, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of the positions represents the findings of the ALJ, this Court must affirm. *Perks*, 687 F.3d at

1091; *Cox*, 495 F.3d at 617.  Based on the foregoing, the Court concludes that the ALJ properly accounted for Plaintiff's speech and cognitive limitations to the extent supported by the record and the ALJ's residual-functional-capacity determination is supported by substantial evidence as a whole.

### 3.  Credibility Determination

Lastly, Plaintiff argues that the ALJ erred in assessing her credibility by improperly considering the settlement she received in connection with her accident and drawing an inappropriate conclusion from the general absence of relevant complaints between summer 2009 and spring 2011.

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision."  *Julin*, 826 F.3d at 1086 (quotation omitted); *see McCoy*, 648 F.3d at 614 ("If an ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so, [courts] will normally defer to the ALJ's credibility determination.").

> When evaluating the claimant's subjective complaints, the ALJ must consider all of the evidence, including objective medical evidence, the claimant's work history, and evidence relating to the *Polaski* factors: (i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions.

*Julin*, 826 F.3d at 1086 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 416.929(c)); *see McCoy*, 648 F.3d at 614 ("In assessing a claimant's

credibility, an ALJ must consider all of the evidence related to the subjective complaints, the claimant's daily activities, observations of third parties, and the reports of treating and examining physicians." ).

At the hearing, the ALJ inquired whether Plaintiff received a settlement from the accident and the amount of any such settlement. Plaintiff responded that she received a monthly annuity for the rest of her life. When assessing Plaintiff's credibility, the ALJ noted that Plaintiff "had a part[-]time employment history even before the alleged onset date of disability." (Tr. 29 (citation omitted).) The ALJ observed that Plaintiff "may not have had motivation to work full[-]time before the car accident and the substantial settlement may reduce the motivation to return on a full[-]time basis." (Tr. 29.) Without citation to any authority, Plaintiff declares that "[c]onsideration of insurance payments is not allowed" and contends that "[i]t should be presumed that the ALJ improperly considered and weighed these payments, and his decision[] should be reversed." (Pl.'s Mem. in Supp. at 18.)

Albeit not in the settlement context, authority outside the Eighth Circuit exists for the proposition that an ALJ may not consider a claimant's receipt of workers' compensation benefits as giving a claimant less motivation to return to work. *See, e.g.*, *Buchan v. Astrue*, No. 08-4099-JAR, 2009 WL 2176046, at *6 (D. Kan. July 21, 2009) ("The law is clear in the Tenth Circuit and in this district. It is error for the ALJ to use the receipt of workers' compensation in his credibility analysis to suggest plaintiff might not be motivated to work.") (citing cases). It is far from clear, however, that the Eighth Circuit Court of Appeals would reach the same conclusion. *See Renstrom*, 680 F.3d at

31

1067 ("[T]he ALJ discussed Renstrom's work history, finding Renstrom had a possible disincentive to return to work because of his worker's compensation litigation. . . . [This and other] inconsistencies in the record as a whole undermined the credibility of Renstrom's allegations."). Although the funds at issue were part of a settlement and not workers' compensation benefits, Plaintiff has not provided any authority to the Court showing that such consideration by the ALJ as one factor in the overall credibility determination was error.

In any event, the ALJ did not merely discuss Plaintiff's settlement, and the Commissioner is correct that an ALJ may consider a claimant's motivation to return to work when assessing credibility. *See, e.g.*, *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002); *Ramirez v. Barnhart*, 292 F.3d 576, 581 n.4 (8th Cir. 2002); *Thiele v. Astrue*, 856 F. Supp. 2d 1034, 1050 (D. Minn. 2012). Here, the record supports that Plaintiff was employed less than full time even before the accident. "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Plaintiff does not challenge the ALJ's findings with respect to her history of part-time work, but argues that her attempt to work as a cashier for her former employer following the accident and her nursing assistant coursework demonstrate her motivation to work. As the ALJ reasoned and the Commissioner points out, Plaintiff's return to work at a reduced degree of responsibility following her accident while admirable suggests that Plaintiff's impairments were limiting but not disabling. *See Goff v. Barnhart*, 421 F.23 785, 792 (8th Cir. 2005) ("Working generally demonstrates an ability to perform a substantial gainful activity.").

This is particularly true considering that Plaintiff reported to Dr. Trulsen that she left her job because she felt that she was treated poorly. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." *Id.* at 793; *see Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) (fact that claimant left work for reasons other than medical condition relevant to consideration of claimant's subjective complaints). While Plaintiff now suggests that it is "likely [that she] left her position . . . because she could not do the work," (Pl.'s Reply at 11, ECF No. 17), it is not the function of this Court to reweigh the evidence before the ALJ.

Plaintiff also argues that the ALJ did not take into account that her progress in speech therapy had plateaued when considering her history of medical treatment. Noting that "the record is generally absent presentations for relevant complaints from summer 2009 until spring 2011," the ALJ concluded that this "absence of care does not suggest the degree of deficits alleged." (Tr. 28.) Significant gaps in treatment can undermine a claimant's credibility. *See, e.g.*, *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 373 (8th Cir. 2016). Similarly, "[i]nfrequent treatment is also a basis for discounting a claimant's subjective complaints." *Kelley*, 372 F.3d at 961. While Plaintiff's progress in speech therapy may have plateaued, it was not unreasonable for the ALJ to conclude that the absence of continuing treatment and the several years' gap before Plaintiff returned to Dr. Leaf seeking medication to improve her memory were inconsistent with the level of impairment alleged.

Essentially, Plaintiff is asking this Court to review her credibility *de novo*. "Questions of credibility are for the ALJ in the first instance." *Whitman v. Colvin*, 762

F.3d 701, 707 (8th Cir. 2014) (quotation omitted); *see Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). Here, the ALJ gave good reasons for finding Plaintiff's subjective complaints regarding her speech and cognitive limitations following her traumatic brain injury not fully credible. The ALJ properly took into account the gap in Plaintiff's medical treatment, Plaintiff's departure from her cashiering job for a reason unrelated to her medical conditions, and the inconsistency not only of Plaintiff's work activity, but her varied daily activities with the degree of impairment alleged. The Court concludes that substantial evidence in the record supports the ALJ's credibility determination.

## VII. ORDER

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement (ECF No. 12) is **DENIED**.

2. Defendant's Motion for Summary Judgment (ECF No. 15) is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: September___27___, 2017                    _____*s/ Tony N. Leung*_____
                                                  Tony N. Leung
                                                  United States Magistrate Judge
                                                  for the District of Minnesota


                                                  *Longley v. Berryhill*
                                                  Case No. 16-cv-2071 (TNL)